# DARLINGTON *v.* TURNER.

---

APPELLATE PRACTICE; APPEAL BONDS; STIPULATION OF PARTIES; VARIANCE; EQUITY; TRUSTS AND TRUSTEES; LACHES; INTEREST.

1. This court has no power to set aside its rules relating to appeals, and to permit a bond to be filed in this court in lieu of one that should have been filed in the court below as prescribed by those rules. (Following *United States ex rel. Mulvihill* v. *Clabaugh,* 21 App. D. C. 440.)

2. Where, on an appeal being taken by the defendants from a decree holding their testator to have been a trustee for the complainants and referring the cause to the auditor for an accounting, a supersedeas bond was given, and a stipulation entered into between the complainants and defendants that the appeal should not be heard until the auditor made his report, when it should be heard with the appeal to be taken from the final decree then to be entered, and that the transcript of the record on the first appeal and that of the record of the proceedings since such appeal should together constitute the record of the last appeal;—it was *held,* in denying a motion to dismiss the last appeal on the ground that no bond for costs was given, that, under the circumstances, the bond given on the first appeal was sufficient to sustain the entire appeal.

3. Where a bill in equity sought to charge with a trust a fund in the hands of the executors of a deceased trustee, consisting of certain securities purchased by the decedent for the complainants' intestate; and the proof showed that a portion of the trust fund did not continue in the possession of the decedent up to the time of his death, but was wrongfully paid over by him to the father of the complainants,—it was *held* that there was no such fatal variance between the

allegations of the bill and the proof as would require the dismissal of the bill.

4. Where, in a suit in equity to recover a trust fund, it appeared that the defendants' testator, Tracy, had for many years invested and reinvested money for Turner in real estate notes and other securities; that Turner by his will left his entire estate to his four minor nieces and nephews, directing Tracy to distribute the proceeds equally between them; that thereafter Tracy paid over the bulk of the funds in his ·hands to the father of such minors, who receipted therefor as "natural tutor and agent of his minor children," and the father converted the fund to his own use, with the exception of small sums expended for the support and education of the children and advances to them; and that, after the death of Turner, correspondence between one of said children and Tracy indicated that the latter regarded himself as trustee for the children, in respect at least to the part of the fund retained by him,—it was *held* that (1) the relation between Tracy and·Turner had been that of trustee and *cestui que trust;* and that (2) after the death of the latter the relation between the former and complainants was the same; (3) that a court of equity had jurisdiction to require an accounting of the defendant executors; and that (4) Tracy had not been relieved of his liability to the complainants by the payment to their father and the receipt therefor, executed by him.

5. The length of time during which a party neglects the assertion of his rights, which must pass in order to show laches, varies with the peculiar circumstances of each case, and is not, like a matter of limitations, subject to an arbitrary rule. (Following *Pryor* v. *McIntire,* 7 App. D. C. 417.)

6. The testimony in a suit for an accounting against the estate of a deceased trustee, *reviewed* and the complainants *held* not guilty of laches which would preclude recovery by them, it appearing, among other things, that the relations between the complainants and deceased trustee were such as to excuse the failure to prosecute any inquiry which might have led to full knowledge of their rights, and that the death of the trustee did not raise up any special equity in behalf of his estate.

7. The ratification of a report of the auditor allowing interest upon a fund in the hands of the executors of a deceased trustee from the date of the violation of his trust by paying the fund over to a third person not entitled to it, *held* not to be erroneous.

8. The estate of a deceased trustee *held* to be entitled to credit for part of a trust fund paid over by him to the father of his *cestui que trust,* although the latter claimed that the payment to him was in settlement of a debt due to him by his father, where it appeared that the

father had no money of his own at the time, excepting that derived from the trustee.

Nos. 1266 and 1460. Submitted January 18, 1905. Decided February 7, 1905.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia in a suit to recover a trust fund alleged to be in the hands of the defendants as executors of the deceased trustee.    *Modified and affirmed.*

The COURT in the opinion stated the case as follows:

This is a suit to recover a trust fund.    The bill was filed in the supreme court of the District of Columbia, on June 10, 1899, by Erle H. Turner, Wilmer Turner, and by Lunette Turner and Ashby Turner, by Wilmer Turner as next friend, against Joseph J. Darlington and George W. Gray, as executors of Philip A. Tracy, deceased.

The bill alleges that complainants are the children of Thomas M. Turner and the nieces and nephews of one Silas H. Turner, deceased, late a resident of Warrenton, Virginia; that in April, 1888, and for many years prior thereto, Philip A. Tracy was the agent and trustee of said Silas H. Turner, and as such intrusted by him with large sums of money for investment, amounting to about $29,000; that on April 30, 1888, Philip A. Tracy prepared and wrote a will for Silas H. Turner at the latter's request; that said will was duly executed by said Silas H. Turner, whose signature was attested by Philip A. Tracy and Geo. G. Fenton, and reads as follows: "I hereby give and bequeath to the four children of my brother Thomas M. Turner, of Minden, Louisiana, all property, real and personal, owned by me, or in which I have an interest, at the time of my death, and appoint Philip A. Tracy to distribute the proceeds of said property equally between them;" that on said date Thomas M. Turner, the father of complainants, lived at Minden, Louisiana, where they also resided; that Erle H. Turner was then nineteen, Wilmer Turner, thirteen, Ashby Turner, nine, and Lunette Turner,

six years old, respectively; that Silas H. Turner died in Fauquier county, Virginia, September 21, 1888, and his will aforesaid was, upon the testimony of said Tracy and Fenton, admitted to probate in said county on the 28th day of November, 1888; that the said will appointed no executor, and no administrator of the estate of said Silas H. Turner was ever appointed; that at the date of the execution of said will, and of said probate, and thereafter said Tracy was and continued to be in the possession of the entire estate of said Silas H. Turner, consisting of promissory notes of various persons secured by deeds of trust upon real estate in the District of Columbia, and of the interest in money accruing, due thereon, amounting in the aggregate to about $30,000; that before the death of Silas H. Turner the said Tracy gave him a list of said notes, showing dates and amounts and the names of the makers, which list set out in full shows notes representing a total of $28,972.10; that said notes were all paid and collected after the death of said Silas H. Turner, but complainants have no means of knowing what disposition was made of the proceeds, wherefore they are entitled to discovery by defendants; that after the death of said Silas H. Turner said Thomas M. Turner exhibited the aforesaid list of notes to said Tracy, who acknowledged its correctness and his possession of said notes, and declared them all "good as gold;" that said Tracy never distributed the proceeds of the property in his possession, or any part thereof, among complainants, as required by said will, save and except certain small sums, paid between 1890 and 1898, to Erle H. Turner, amounting to about $1,400; that said Tracy retained to the day of his death the remainder of said property, and all the said fund, principal, interest, and profits have come into the possession of the defendants as his executors; that during the interval between the death of Silas H. Turner and that of Philip A. Tracy the latter acknowledged the possession of said trust fund and his trusteeship thereof, but represented that the same was invested with funds of his own in land, and that, owing to depreciation in values, he was unable to collect either principal or income; that said Tracy died July 5, 1898, leaving a will in which the defendants were appointed

executors, and that they have caused the same to be probated, and have received letters testamentary.    Other allegations of the bill state the distant residence of the complainants, their want of knowledge of the facts concerning the bequest in the will of Silas H. Turner, the amount and character of the trust fund, and certain conduct of Tracy tending to deceive them and prevent inquiry, knowledge, etc., by way of explanation of the delay of Erle and Wilmer Turner after arriving at age of maturity in bringing their suit.    It is further alleged that no one of the complainants had ever had a guardian of their estates and persons, or any other person authorized by law to demand or receive the said property belonging to them under the terms of the will of Silas H. Turner.

The prayers are for the discovery of all papers and documents of said Tracy relating to the trust; that said Philip A. Tracy, deceased, be decreed to have been, from the death of Silas H. Turner to the time of his own death, a trustee of complainants as to the whole estate of Silas H. Turner, and accountable for said trust funds, and that the defendants are accountable for the same since his death; that defendants make full discovery as to what proceeds were realized from any disposition of said notes, and as to what profits, if any, were realized by the investment of the money, and what disposition has been made of the same; that defendants be required to account for the amount of the notes described in the list before given, together with interest on the same and profits therefrom, from September 21, 1888; that defendants be decreed to pay over to complainants the total amount of said trust estate on a proper accounting, and that they have such other and further relief as the nature of their case may require, etc.

The answer admits that Tracy had relations with Silas H. Turner under which he held and invested funds of the latter, of the nature of which defendants have no knowledge, but denies that Tracy continued after the death of said Turner to retain possession of his estate.    It avers on information and belief that Philip A. Tracy, after the death of Turner, properly accounted for and disposed of the funds, etc., in his hands, and at

the time of his death, on July 5, 1898, did not have in his possession any notes or other securities of said Silas H. Turner's estate; that none have come into the hands of his executors since his death. The following paper written by said Tracy was set out in the answer as having come into the possession of defendants, and its production offered:

WASHINGTON, D. C., ———, 1898.

To the executors of my last will and testament:

Some time in 1871, Silas H. Turner, of Virginia, whom I had known for a long time, of his own volition and without solicitation from me, came to the city and asked me to aid him in investing some twelve thousand dollars ($12,000) in real-estate notes. I consented, and in a few weeks the whole amount was invested, and he took the notes home with him. The interest was payable semi-annually, and, for a time, he sent me notes by mail about the time the interest was due so that it could be credited on the notes to satisfy the maker. This became irksome and, after a time, he brought me the notes, keeping a list of them, and asked me to keep them to save him the trouble of sending them to me by mail whenever the interest was due. I kept the notes in an envelope with his name upon it, and about twice a year sent him a memorandum of interest paid, and when the amount reached several hundred dollars I would buy another note, and send him a memorandum of the same. Also when a note matured and was paid, I would buy another note, unless he needed the money, which he rarely did, and send him a memorandum of it. This condition continued until 1888, when he died in Virginia, leaving his entire estate to the three minor children of his brother then living in Louisiana. In his will he named me to settle up the estate and divide the money among the children; but, as the laws of Virginia require two witnesses to a will, and say neither of them shall be an executor I could not qualify, and, as the father, if appointed, could not have given the bond, I handed him the package of notes, advised him to deposit them in the Second National Bank of Washington, D. C., which he did, and

agreed to look after them, and have them all paid, he being out of the city. His other relations—a sister, some nephews and nieces—were much displeased with the will, and threatened to attempt to have it set aside, but have not done so. The father — a good, honest man — took the money, or most of it, went to Texas and bought a farm, and was doing well until the panic of 1893 came on. Since then they had a hard time, getting little or nothing for their farm products, and have written me some heartrending letters wishing they had left the money here. The children are of age, but, of course, the father could not pay them their parts of the estate, and, though not a word has been said about it, I thought perhaps after my death, if they hear of it in time, some of them might attempt to hold me responsible, and if they should make such an attempt, I hereby authorize and direct my executors to employ the best counsel in the city to defend my estate in the District courts and in the Supreme Court of the United States, if it be necessary to appeal the case to that court, and to pay all costs and lawyers' fees out of my estate. I suppose some one would have to qualify as administrators under the will before any action could be taken. My turning the property over to the father helped to keep it in the possession of those to whom it was left, and to discourage and shut out the dissatisfied relatives, for if anyone had qualified the matter would have been open for a year, and they would undoubtedly have made an attempt to have the will set aside. This is a plain statement of the case intended for the private ears of my executors.

The answer further sets out a paper found by them among the papers of Philip A. Tracy, purporting to be a list of notes and a receipt for the same by Thomas M. Turner, as follows:

Full list of notes and cash in the hands of Philip A. Tracy belonging to S. H. Turner, deceased, Nov. 30, '88.

Date of notes.
March 22, '84. Two notes of John B. Taylor for
              $1,000 each ................. $2,000 00

| | | | |
|---|---|---|---|
| May 19, '86. | Two notes of Julius Rehwold, $300 each .................. | 600 | 00 |
| May 19, '86. | Two notes of Julius Rehwold, $800 each .................. | 1,600 | 00 |
| April 18, '87. | One note of Louisa A. Grant..... | 300 | 00 |
| March 12, '86. | One note of Diller B. Groff...... | 1,500 | 00 |
| March 12, '86. | One note of Diller B. Groff...... | 1,000 | 00 |
| Dec. 15, '85. | Two notes of Eliza U. Lee, $600 each . . . . . . . . . . . . . . . . . . . | 1,200 | 00 |
| June 13, '88. | One note of Roth & Moore....... | 325 | 00 |
| Jan'y 19, '81. | One note of Edwin F. Jones..... | 1,000 | 00 |
| Feb. 18, '88. | One note of Charles W. Baldwin. | 2,500 | 00 |
| Jan'y 27, '88. | Three notes of Alban H. Nixon, $450 each .................. | 1,350 | 00 |
| July 12, '81. | Two notes of Flora V. Andrews, $500 each .................. | 1,000 | 00 |
| Oct. 30, '86. | Three notes of John B. Avery, $200 each .................. | 600 | 00 |
| Oct. 22, '86. | Seventeen notes of Thos. H. Benton, $120 each............... | 2,040 | 00 |
| Aug. 25, '88. | One note of Frank W. Paige..... | 3,000 | 00 |
| Oct. 17, '88. | Three notes of J. L. Burns, $462.-50 each ................... | 1,387 | 50 |
| Nov. 6, '88. | One note of E. V. Jarvis........ | 200 | 00 |
| Nov. 19, '88. | Two notes of C. S. McEwen ($600 each) . . . . . . . . . . . . . . . . . . | 1,200 | 00 |
| | Two lots on Md. Ave. N. E...... | 1,800 | 00 |
| Sep. 28, | Cash, T. M. T................. | 439 | 25 |
| Nov. 30, | Cash, T. M. T., in full.......... | 337 | 64 |
| | (In'st now due)............. | 600 | 00 |
| | | $25,379 | 39 |

"Nov. 30, '88.—Received the above described notes and cash in full under the will of S. H. Turner, deceased.

                                        T. M. TURNER,
              Natural Tutor and Agent for My Minor Children.

("Notes all placed in Second National Bank by T. M. Turner" in pencil.)

It is further averred that said Thomas M. Turner received the notes and money aforesaid and deposited them in the Second National Bank of Washington for collection, and that the entire proceeds were drawn by him and applied to the benefit of complainants; that Tracy, between September 6, 1894, and May 17, 1895, took receipts from Erle H. Turner for $1,435 in all, all of which are in the possession of the defendants; that Thomas M. Turner signed said receipt as "natural tutor and agent for my minor children," as appears therefrom; and that defendants do not know in what State he and his children had their domicil and residence at the time of the death of said Silas H. Turner, and are unable to say what were the lawful rights and powers of said Thomas M. Turner in the premises. The answer concluded with averments that complainants are not entitled to any relief by reason of their gross laches, and that they have shown no right to maintain their suit.

Replication was filed by the complainants, and evidence was taken. As the foundation of their demand the complainants offered the list of notes set out in the bill as given by Tracy to Silas H. Turner, as follows:

### S. H. TURNER.

| | |
|---|---|
| Nov. 18, '82. (W. Z. Partello) paid.......... | $0,000 00 |
| Nov. 1, '79. Susan W. McNamee............ | 1,700 00 |
| Jan. 19, '81. Edwin F. Jones.............. | 1,000 00 |
| April 7, '75. J. H. Hollidge............... | 800 00 |
| March 22, '84. John B. Taylor............... | 1,000 00 |
| March 22, '84. John B. Taylor............... | 1,000 00 |
| July 12, '81. Flora V. Andrews (2).......... | 1,000 00 |
| June 6, '85. Jennie J. West............... | 3,400 00 |
| April 3, '85. Caroline Isdell (2)........... | 1,335 20 |
| Dec. 15, '85. Eliz. V. Lee................ | 600 00 |
| Dec. 15, '85. Eliz. V. Lee................ | 600 00 |
| Jan. 8, '86. Mary J. Lewis (3)............ | 1,200 00 |

| | | | | |
|---|---|---|---|---|
| Dec. | 30, '85. | John L. Carusi................ | 1,350 | 00 |
| May | 19, '86. | Julius Rehwold (4)............ | 2,200 | 00 |
| Dec. | 24, '85. | Rufus A. Morrison............. | 1,500 | 00 |
| Oct. | 30, '86. | John B. Avery (4)............ | 800 | 00 |
| Oct. | 2, '86. | Thomas R. Benton (15)........ | 1,800 | 00 |
| June | 1, '86. | G. H. La Fetra............... | 1,036 | 90 |
| April | 18, '87. | L. A. Grant.................. | 300 | 00 |
| Aug. | 20, '85. | D. B. Groff.................. | 1,500 | 00 |
| | | (Footing in lead pencil)............ | 24,122 | 10 |
| | | *Second Sheet.* | | |
| | 1888. | Am't for'd (in lead pencil).......... | 24,122 | 10 |
| Feb. | 18. | C. W. Baldwin................ | 2,500 | 00 |
| Jan. | 27. | A. H. Nixon (3).............. | 1,350 | 00 |
| Mar. | 12. | D. B. Groff.................. | 1,000 | 00 |
| | | (Footing in lead pencil)............ | 28,972 | 10 |

This paper was proved to have been written by Philip A. Tracy, and Thomas M. Turner testified that he showed the same to said Tracy, after the death of Silas H. Turner, who acknowledged its correctness, and said the notes were as "good as gold."

Proof was made showing that the complainants were the four children of Thomas M. Turner and the beneficiaries named in the will of Silas H. Turner; that they were of the ages charged in the bill at that time, and were living at Minden, Louisiana, with their father and their mother, upon a small farm belonging to the latter; that Thomas M. Turner came to Fauquier county, Virginia, in September, 1888, and found Silas H. Turner approaching his death; that upon the decease of the latter he found the will described in the bill in testator's trunk, and also the list of notes aforesaid; that the said will was duly probated in a court of competent jurisdiction in Fauquier county, Virginia, November 28, 1888, upon the depositions of the subscribing witnesses, Tracy and Fenton; that Thomas M. Turner did not tell complainants of the terms of the will, but afterwards represented to them, and led them to believe, that he was the beneficiary

of the same; that after the probate of the will, Thomas M. Turner returned to Washington, and had several interviews with Tracy, and on November 30, 1888, received from him the notes described in his receipt to Tracy of that date; that he did not receive the $1,800 described as "lots on Maryland avenue, N. E."

This item, it was afterwards shown, represented real estate in the name of Tracy in which he had invested funds of his own and of Silas H. Turner; that none of said money was paid over to the complainants, but some parts were expended by said Turner in their maintenance, he not having sufficient property of his own to provide for them properly. Some evidence was introduced by the defendants, on the part of relations of Silas H. Turner, who were present when the will was found, to the effect that it was read and its provisions discussed and generally known at the time; but neither the complainants nor their mother were present,—they were, in fact, at home in Louisiana.

Erle H. Turner testified that he came of age October 21, 1889; that he was in Louisiana at the time of the death of Silas H. Turner, whom he had never seen, and had no knowledge of the disposition of his estate; that he was informed that his father inherited his estate; that he was in Washington in 1891 and saw Tracy, who told him that he had an interest in the estate, and that he (Tracy) had invested it in real estate, but did not say how much; that he did not know what the interest was or what it consisted of until he got the list from Thomas M. Turner just before bringing this suit; that Thomas M. Turner was in Washington in April, 1891, and turned him over $1,200, which he deposited in bank; that with the exception of a visit to Texas, he remained east, staying at Philadelphia most of the time; that he also received two notes from Thomas M. Turner; that the payment was made in settlement of his father's indebtedness to him on account of his share of a wheat crop raised on the farm in Wilbarger county, Texas, which Thomas M. Turner bought and improved in 1889 and 1890. Certain letters were introduced as passing between Erle H. Turner and Philip A. Tracy between November 20, 1893, and April, 1898. During this period Tracy

remitted him sums of money in various amounts, aggregating $1,365, for which Erle H. Turner executed receipts.

Without setting out these letters or giving the substance of each of them it is sufficient to say that the first of Tracy's, dated November 20, 1893, and the second, dated March 16, 1894, tend to corroborate Erle H. Turner's statement that he had no knowledge of the amount or nature of the trust fund in the hands of Tracy, but supposed that it was a sum much less in amount than afterwards learned, and was then invested in real estate.    In the first he said:   "The ground upon which I loaned the estate money and some of mine would not, I fear, bring enough to get us out clear, if sold now, and so I will have to wait for better times.    *    *    *    I look for a still further decline in real estate values."    He then advises him to get any employment he can, and to "stay right where you are and work like a Turk."    In the second he advises him to work if he can get even enough to pay his board, and says he will try to let him have some money before long.    He then adds:   "I am trying to sell the ground upon which the estate's money and $1,400 of mine is loaned, but I can find no one that seems to want it, though they say it is good for the loan."    In a third letter, of May 8, 1894, he says:   "I am sorry for you, but you should never have come east without money in such times as these.    I have no money in hand belonging to the estate, though I have been trying my best to collect interest on the notes.    I sent you $20 in a letter March 22, which I suppose you received.    *    *    *    I had all the money belonging to the estate in hand, and was ready to turn it over to your father, but, you remember, you and your mother raised a racket. I consulted a lawyer and he advised me to hold back.    The money was then invested, and you have drawn the interest as long as it was paid up to the time the panic came on.    Since then I have not been able to collect anything."    As late as February 11, 1898, he wrote, "I have no money in hand belonging to you or the estate.    It is all in the ground."

Miss Wilmer Turner testified that she became twenty-one years of age October 11, 1896.    In 1890, 1891, 1892, and 1893 she was at school in Virginia.    She taught school in Virginia in

1894, and went to Texas in 1895 and lived with the family in Vernon, Wilbarger county, they having removed there from Louisiana in 1889 or 1890. In September, 1896, she returned to Virginia and taught school there, receiving from $100 to $145 per year with her board. She, as the others, had the impression that Silas H. Turner had left his estate to her father. She had no knowledge of the facts until just before bringing suit, though she had heard between 1893 and September, 1896, from her mother that she had some interest in funds in Tracy's hands. She heard from her mother of Tracy's letter to the latter dated August 21, 1894, giving his account of the investment. In that letter to Mrs. Turner Tracy said: "* * * There is no money in my hands belonging to the estate of S. H. Turner. After you and Erle raised a fuss because he had not gotten his share, I became alarmed and consulted a lawyer, and he advised me not to turn over another dollar of the estate money until Mr. Turner qualified for the full amount of the estate. I informed your husband of the fact, and he declined to qualify (the bond would be over $50,000) and he and Erle agreed that I should invest the money so that it might be earning something while in my hands. I then invested the money in what was then good real-estate paper, but the panic came on last year, the indorser of the notes failed in business, and the land has depreciated in value, so that if it were sold now I do not think it would bring half the amount of the notes. I have over $1,400 of my money in the same land. If times should ever get good again, which I doubt, the land would be ample security for the notes."

In 1895 Tracy, who was in the Postoffice Department, procured a ticket from Charlottesville to St. Louis, and sent it to Miss Turner, who was about to visit Texas. There was no correspondence between them relating to any interest of hers in Silas H. Turner's estate. His letter shows that he knew she had been teaching for $100 per year, which he wrote her was a good salary these hard times (August 7, 1897).

Thomas M. Turner testified to deceiving his children in regard to the contents of Silas H. Turner's will at the time, and to his continued concealment. It appears that the paper contain-

ing the list of notes given by Tracy to Silas H. Turner was on two sheets pasted together at the top; neither was a full sheet. The discrepancy between the total of this list and that showing the receipt of Thomas M. Turner was accounted for by Thomas M. Turner substantially to this effect: He said that when he returned to Washington Tracy handed him the list, which afterwards he signed the receipt for and asked if it would be a satisfactory settlement; that having examined it that night he was not satisfied, as there was a difference of about $6,000; that he told Tracy of this at the next interview and Tracy said he would not qualify as executor of the will, and that if I attempted to qualify as guardian or administrator he was satisfied the heirs of my brother in Virginia would contest the will; he further said there would be a good deal of cost attached, and that I would have to give a bond of double the amount of the whole estate, and that would be difficult for me to do; he also said there would be a legacy or inheritance tax of several thousand dollars; that, all things considered, this amount would be more, perhaps, than I could get clear if I were to administer; that if I would settle by this list, he would turn over the property to me without having anybody appointed as executor or administrator, and the notes could be put in bank and collected; that if I would get away quick that would prevent the other heirs from trying to break the will. Witness further said that he accepted the notes tendered, though less by about $6,000, than the amount in Tracy's hands, because he thought it best not to antagonize him, and that he thought it was the best that he could do. In a letter of Philip A. Tracy to Thomas M. Turner, dated May 7, 1892, referring to $2,600 which he had invested at 8 per cent interest, he said: "I have thought something of transferring to Miss Henrietta a part or perhaps all, of the commission I charged on your brother's estate (5 per cent), as she was left out in the will and is poor. * * * This amount of my charge for attending to the business for sixteen years ($120 a year) will stand."

Several witnesses of the defendants (all relations of Thomas M. and Silas H. Turner) testified to the facts concerning the finding of the latter's will and the general knowledge of its contents, etc.

These said that Thomas M. Turner told them, after his return from Washington in November, 1888, that he had given up $6,000 that went in the way of commissions to Tracy; that when told that this was a large commission Turner replied that he thought it would be better to settle on Tracy's terms, for if he did not it would protract the settlement of the estate and might cost more in the end. One of these witnesses said he had never heard of any intention to contest Silas H. Turner's will.

Defendants produced the paper of instructions by Philip A. Tracy, a copy of which has been given in the statement of their answer, and it was agreed to be in the handwriting of said Tracy. Tracy had neither children, brothers, or sisters, nor father or mother, at the time of his death. His will was read in evidence. It appoints defendants executors, and, after certain small legacies, gives the bulk of his estate to the trustees of Trinity Episcopal Church and the trustees of Epiphany Church Home, in the city of Washington.

On October 10, 1892, the court entered the following decree:

"This cause came on regularly to be heard upon the pleadings and evidence, and having been argued by counsel for complainants and defendants, and submitted to, and considered by, the court, it is, by the court, this 10th day of October, A. D. 1902, adjudged, ordered, and decreed:

"First. That the defendant's testator, Philip A. Tracy, was trustee for the complainants in respect of all of the property and estate of Silas H. Turner being or coming into the hands of said Tracy at and after the death of the said Silas H. Turner.

"Second. That the complainants are entitled to an accounting from the defendants as executors of the said Philip A. Tracy of and concerning the moneys and properties received by said Tracy from said Silas H. Turner.

"Third. That this cause be and the same hereby is referred to the auditor of this court to state such account, and that on such accounting the defendants shall be entitled to credit for the sums which it appears from the evidence were paid at various times by the said Tracy in his lifetime to Erle H. Turner, one of the complainants, after said Erle H. Turner had attained his majority.

"Fourth. That for the purpose of stating the account herein directed to be stated, and of ascertaining what credits the defendants may be entitled to, the auditor is to consider all the testimony in the case bearing on that subject, and is authorized to take further testimony, as the parties to this cause may desire, as to the correctness of the allegation of the defendants that the money received by Thomas M. Turner from said Tracy was expended for the benefit of the complainants or any of them, that the expenditures were reasonable for the complainants under the circumstances, and that the said Thomas M. Turner was unable to support the complainants, his children, from his own means.

"Fifth. Upon the completion of said hearing before the auditor the said auditor shall report to this court the said statement of account and his proceedings under this reference for the final decree of this court thereon."

From this decree defendants entered notice of appeal on October 29, 1892. Appeal bond was filed and citation issued and served. On the same day the following stipulation was entered into:

"It is hereby stipulated and agreed that the appeal taken to the court of appeals of the District of Columbia by the defendants in the above-entitled cause from the decree entered on the 10th day of October, 1902, by the supreme court of the District of Columbia, sitting in equity, shall not be heard in said court of appeals until the appeal that shall be taken from the decree to be entered upon the coming in of the auditor's report on the reference made to the auditor in and by the aforesaid decree shall be heard; also that the transcript of the record on said first appeal and the transcript of the record of the proceedings since said appeal shall, together, constitute the record on said last appeal; and further, that request shall be made to said court of appeals to pass such order as may be necessary to carry into effect this agreement, and to secure the hearing by said court upon a complete record of the appeal from said decree of October 10, 1902, and from the decree that shall be entered upon and in respect of the auditor's report by the said supreme court of the District of Columbia.

"October 29, 1902."

The transcript of the record was filed in the court of appeals in due time, and the cause was docketed in said court as No. 1266. Pursuant to the agreement, the case was continued from time to time to await the auditor's report and the final decree thereon.

The auditor made a report on March 9, 1904, accompanying the same with a statement of the account taken:

He charged Tracy, as trustee, with the notes and cash belonging to Silas H. Turner's estate on September 28, 1888, amounting to $27,611.35, but credited the same with funeral expenses and other charges, $630, making the total, $26,981.35. He also charged Tracy with $3,069.65 as the amount received from the real-estate investment of $1,800 mentioned in the original statement and list given by him to Silas H. Turner. Interest was also charged on these balances.

This fund was apportioned among the four complainants in equal portions. Erle Turner was charged with the payment made by Tracy to the amount of $1,365, with $400 received while a minor, and with the value of two notes received from those belonging to the estate, amounting to $525. Each of the others was charged with the cost of education and maintenance that had been paid by Thomas M. Turner out of the fund received by him from Tracy. These sums amounted in the aggregate, including interest from September 30, 1888, to $48,641.44.

The defendants excepted to the report of the auditor of any liability whatever, and especially because the same was not determined by the receipt of Thomas M. Turner, instead of by the original list of notes furnished by Tracy to Silas H. Turner. Special exceptions were also taken to the charge of interest on the trust fund, to the failure to charge Erle H. Turner with the sum of $1,200 paid to him by Thomas M. Turner, April 10, 1891, and to the failure to charge Wilmer Turner with an additional sum of $360 on account of education and maintenance by Thomas M. Turner. These exceptions were all overruled. A stipulation of counsel was filed on the hearing, in which it was agreed that the defendants had in their hands as executors, subject to final decree, the sum of $47,000, and lots 1 and 7 in

block 649 in the city of Washington. It was further agreed that all debts proved against the estate had been paid, except that of complainants, and that all debts and the legacies, except $1,000 to the trustees of Oak Hill Cemetery, $2,000 to Trinity Church, and the residuary bequest to Epiphany Church Home, had been paid in full before notice of the claim of the complainants; all of which payments are assented to.

Final decree was entered on June 9, 1904, confirming the auditor's report and establishing the several demands as therein set forth. Notice of appeal was given therefrom.

On July 8, 1904, complainants moved in the equity court to dismiss this appeal because no supersedeas bond had been filed, or deposit made, to cover costs on appeal, as required by the rules of the court of appeals. This motion was granted on the same day without notice to the defendants. July 11, 1904, the defendants filed a motion to vacate the foregoing order and for leave to file a supersedeas bond *nunc pro tunc.* This motion was supported by an affidavit of one of defendants' solicitors which recited the.former proceedings and the filing of the supersedeas bond on the appeal then taken, and approved by consent; also the stipulation as to the postponement of the hearing of that appeal. The affidavit concluded as follows:

"That, in view of the fact that the defendants had filed a supersedeas bond, as aforesaid, for the small penalty with the consent of the solicitor for the complainants, and in view of the further fact, well known to said solicitor, that all the moneys and securities in the hands of the defendants were and are held subject to the decree of the court in said cause, and in view of the facts that the solicitors for the defendants had heartily cooperated with the solicitors for the complainants to obtain the speedy, complete, and final determination of the issues raised by said bill and answer,—the solicitors for the defendants well supposed that the giving of a bond, in.respect of the appeal taken from the decree on the 8th day of June, 1904, if not wholly unnecessary in view of the situation of the case in the court of appeals, was yet a matter of form, of no real importance; that the failure of the solicitors of the defendants to file a

bond, as apparently required by the rules of the court of appeals, was occasioned by the accidental mislaying of the bond that had been prepared and signed by one of the appellants and by the inability to obtain the signature of the other appellants until after the 1st day of July, 1904, the day on which the time for the filing of a bond expired under the rules of the court of appeals."

An affidavit in opposition was filed in which it was said that counsel for complainants had discussed the effect of the former appeal with opposing counsel, and expressed the opinion that the order was not appealable: that opposing counsel expressed himself as unwilling to take the risk of losing his opportunity to reverse that decree on appeal should it ultimately be held to be final, and affiant suggested to him that he might take the appeal and let it lie until after the decree on the report of the auditor; that opposing counsel then prayed for a special appeal, which was refused; that appellees will be prejudiced, etc., by the failure to give a supersedeas bond in a sufficient amount, etc. The court then vacated the order and denied the motion to give a bond *nunc pro tunc,* on the ground that the entire question was one for the adjudication of the court of appeals. The additional transcript was then filed in this court and docketed as number 1460.

*Mr. R. Ross Perry, Mr. George E. Hamilton, Mr. Nathaniel Wilson,* and *Mr. Clarence R. Wilson* for the appellants.

*Mr. Wm. G. Johnson* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. A preliminary question arises on the motion of the appellees to dismiss the appeal because of the failure of the appellants to file an appeal bond after the rendition of the final decree confirming the auditor's report. This motion was made and argued at the October term, but the court was of the opinion that it should not then be decided, and postponed its further consideration until the hearing on the merits.

It is not necessary to decide whether the first decree was of such finality in substance as to confer a right of appeal without special allowance of the same on application to this court. It is quite certain, however, that it was unnecessary, and that the defendants would have sustained no prejudice by postponing their appeal until a final decree after the auditor's report.

Under former decisions this court has no power to set aside its rules relating to appeals, and to permit a bond to be filed in this court in lieu of one that should have been filed in the court below as prescribed in those rules. *United States ex rel. Mulvihill* v. *Clabaugh,* 21 App. D. C. 440, and cases cited.

Under the special circumstances of this case, however, we have concluded, though not without considerable doubt, that the appeal bond of October 29, 1902, when taken in connection with the stipulation then entered into, is sufficient to sustain the entire appeal. The merits of the controversy were substantially determined by the first decree entered. Nothing remained thereafter but to take the account. The agreement contemplated but one record, and one hearing that should be on all points, and it is fair to presume, considering all of the conditions of the case and the fact that the executors were under bond for the preservation of the estate, that the bond was considered ample for the purposes of the appeal.

2. The first assignment of error is that the bill should have been dismissed because of a fatal variance between the allegations thereof and the proofs.

The contention is that the primary object of the bill is to impress the fund in the hands of the defendants with a trust, on the ground that the trust fund had been specifically traced into their possession as executors of Tracy. We cannot concur in this limitation of the object and scope of the bill. In our opinion its allegations are sufficient to warrant the consideration of all the evidence and the entry of the decree in accordance therewith.

3. We have no doubt of the jurisdiction of a court of equity in this case. The relations between Tracy and Silas H. Turner, even, were not those of debtor and creditor merely, at the time of the delivery by the former to the latter of the list of notes held

for collection and reinvestment of the proceeds. The notes were so indorsed that Tracy could collect, not only interest, but principal also, and reinvest the same; and before Silas Turner's death it appears that he had invested some of the money in land the title to which was in his own name. While Silas Turner might have had a remedy at law against Tracy for the proceeds of the fund, we are not prepared to say that he would not have had a right to resort to equity for a complete accounting and the recovery of the proceeds and profits of the fund when ascertained thereby had a settlement been refused him. However this may be, the relations between Tracy and the complainants, as legatees of Silas H. Turner, were those of trustees and *cestuis que trust*. By the terms of the will he was expressly charged with the distribution of the fund in his possession among the four complainants. *McKee* v. *Lamon,* 159 U. S. 317, 322, 40 L. ed. 165, 167, 16 Sup. Ct. Rep. 11; *Clews* v. *Jamieson,* 182 U. S. 461, 479, 480, 45 L. ed. 1183, 1192, 1193, 21 Sup. Ct. Rep. 845, and cases cited.

Moreover, part of the fund, as we have seen, had been invested in lands along with Tracy's own money, the title to which was in his name. His correspondence with Erle Turner, and occasional payments to him, and the recitals of the paper prepared for his executors, show that Tracy regarded himself as a trustee of the complainants in respect of that part of the fund. And, without regard to his right to turn over a part of the fund to Thomas M. Turner, the proof shows that he retained from him about $6,000 of the original fund to which the complainants were entitled.

4. There is no support for the contention that Tracy was relieved of any part of his responsibility to the complainants by the payment to Thomas M. Turner, and the receipt therefor executed by the latter as natural tutor and agent of his minor children. It is not pretended that there was any authority for the receipt of the fund either under the laws of Virginia, where Silas H. Turner lived and died, and where his will was probated, or under the laws of the District of Columbia, where Tracy resided and where the fund was deposited. Even if resort could be had to the law of Louisiana, where the complainants then lived, we

find nothing in the articles of the Code of that State, which have been brought to our attention, that empowered their father to receive the fund as their tutor, guardian, or agent.

5. There being no doubt of the right of the infants Ashby and Lunette Turner to recover their interest in the trust fund, it remains to inquire whether the adults Erle and Wilmer are barred by reason of their laches.

Under the circumstances it may be questioned whether the bar of laches can be claimed at all on behalf of Philip A. Tracy, who died in July, 1898, because of any express repudiation of his trust brought directly to the knowledge of these complainants within a proper time before his death.

But passing that by, we are clearly of the opinion that there has been no such laches on the part of Wilmer Turner as would justify the denial of her recovery of her part of the fund.

As was said in *Pryor* v. *McIntire,* 7 App. D. C. 417, 430: "The familiar maxim that 'equity aids the vigilant' is a typical doctrine of equity jurisprudence, and in its application best illustrates the beneficent spirit of its administration. The rule is neither arbitrary nor technical, but capable of rigid contraction on the one hand and of wide expansion on the other, in the sound discretion of the chancellor, according to the special circumstances of each particular case. The idea is well expressed by Mr. Justice Brewer in the following words: 'The length of time during which the party neglects the assertion of his rights, which must pass in order to show laches, varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule. It is an equitable defense controlled by equitable considerations, and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them.' *Halstead* v. *Grinnan,* 152 U. S. 412, 416, 38 L. ed. 495, 496, 14 Sup. Ct. Rep. 641." See also *McIntire* v. *Pryor,* 173 U. S. 38, 53, 43 L. ed. 606, 611, 19 Sup. Ct. Rep. 352; *Townsend* v. *Vanderwerker,* 160 U. S. 171, 186, 40 L. ed. 383, 388, 16 Sup. Ct. Rep. 258.

Applying these principles to the evidence relating to Erle H.

Turner, we are of opinion, also, that the defense of laches is not maintainable as to him. The testimony shows that, until a short time before the suit was brought, he had no definite information of the character and amount of the fund in which he had an interest, or of Tracy's misfeasance. Granting that his information was sufficient, under ordinary circumstances, to put him upon inquiry that might have led to full knowledge, we find enough in the relations between him and Tracy, and in the conduct of the latter, as shown in his letters and the payment of small sums of money, from time to time, to reasonably excuse his failure to prosecute that inquiry. Nor has the death of Tracy raised up any special equity on behalf of his estate. No prejudice has accrued therefrom through the loss of any source of material testimony.

6. We find no error in the allowance by the auditor, and its confirmation by the decree, of interest upon the fund in Tracy's hands from November 30, 1888, when he violated his trust by paying the bulk of the fund to Thomas M. Turner, and retaining the remainder, about $6,000, and using it for his own benefit.

7. We are of the opinion that the assignment of error founded on the refusal of the court to sustain the exception to that part of the auditor's report denying the credit of $1,200 upon the portion of Erle H. Turner is well taken. This money was paid to Erle Turner by Thomas M. Turner, in the city of Washington, April 10, 1891, at which time also he received the two notes with which the auditor has charged him. He claims that this was in settlement of a debt due by Thomas M. Turner to him, on account of a small sum of money belonging to him when a boy, which Thomas M. Turner had in his possession, and of an interest in two crops of wheat raised by him on the Texas farm in 1890 and in 1891. The testimony relating to this is not entirely satisfactory, but passing that, we think it is a proper credit in favor of Tracy, because it is clear that the payment was made with money and notes derived from the fund. Thomas M. Turner had no money of his own at the time, and rarely had any at any other time, except that derived from the notes surrendered to him by Tracy in September, 1888.

For the same reason that the amount of the two notes was charged to him in the account, we think that this money, derived from the same source, should have been charged to him therein also.

The final decree having been found to be correct in general, will be modified so as to charge the interest of Erle H. Turner with the said sum of $1,200 as of the date of its receipt by him; and as so modified will be affirmed with costs. It is so ordered.

*Modified, and affirmed.*